UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
DOCKET NO. 1:18-cv-00371-FDW

| | | |
|---|---|---|
| SHEILA D. BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment (Doc. No. 9) and Defendant's Motion for Summary Judgment (Doc. No. 11). Plaintiff, through counsel, seeks judicial review of an unfavorable administrative decision on her application for supplemental security income under 42 U.S.C. § 405(g).[1] Plaintiff raises eleven issues on appeal, alleging errors in the appointment of her ALJ, in forming Plaintiff's RFC, and in applying Plaintiff's RFC. Due to the ALJ's multiple errors in forming Plaintiff's RFC, Plaintiff's motion (Doc. No. 9) is GRANTED, Defendant's motion (Doc. No. 11) is DENIED, and the Commissioner's decision is REVERSED and REMANDED to the Social Security Administration.

## I.     BACKGROUND

Plaintiff filed applications for Title II and Title XVI disability benefits on March 10, 2014, alleging disability beginning August 10, 2013. (Tr. 16). The claims were denied initially on August 22, 2014, and upon reconsideration on June 22, 2015. (Tr. 16). Plaintiff requested a

---

[1] "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

hearing before an Administrative Law Judge ("ALJ") which was held on May 1, 2017, in Charlotte, North Carolina; and during which Plaintiff amended her disability onset date to February 23, 2015. (Tr. 16). After the hearing, the ALJ denied Plaintiff's application in a written decision dated May 31, 2017. (Tr. 13).

To reach this decision, the ALJ followed the five-step evaluation process for disability claims under the Social Security Act ("the Act"). (Tr. 17-18). 20 C.F.R. § 416.920(a)(4). At the first step, the ALJ determined Plaintiff had not engaged in "substantial gainful activity" since her original alleged disability onset date of August 10, 2013. (Tr. 18). The ALJ next determined which of Plaintiff's impairments are "severe." (Tr. 19-20); 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ found Plaintiff's severe impairments are: seronegative arthritis, obesity, diabetes mellitus, osteoarthritis, degenerative disc disease, neuropathy, tobacco abuse, depression, and anxiety. (Tr. 19). At the third step, these severe impairments were determined not to meet or medically equate the severity of impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). (Tr. 20-23); 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. The ALJ, after considering the record and Plaintiff's severe impairments, found Plaintiff had the residual functional capacity ("RFC") to perform light work with the following exceptions:

> "[Plaintiff] can occasionally climb ladders, frequently climb ramps, and stairs, can frequently balance, stoop, kneel, crouch, and crawl, and can frequently handle and finger, bilaterally. [Plaintiff] can frequently be exposed to workplace hazards such as unprotected heights and dangerous machinery. [Plaintiff] can tolerate simple, routine, repetitive tasks, but cannot perform fast or production rate work. [Plaintiff] can tolerate few workplace changes; can occasionally interact with the public. [Plaintiff] must have the option to alternate between a sitting and standing position approximately twice per hour without losing productivity."

(Tr. 23). At the fourth step, the ALJ determined Plaintiff is unable to return to any past occupations. (Tr. 29-30). At the final step, the ALJ considered Plaintiff's age, education, work

experience, RFC, and the testimony of the Vocational Expert ("VE") to determine Plaintiff can adjust to other jobs in the national economy, including marker, mail clerk, and photocopy machine operator. (Tr. 30-31). The ALJ accordingly denied Plaintiff's application. (Tr. 31). Plaintiff requested review before the Appeals Council on May 31, 2017, and it was denied on March 1, 2018. (Tr. 7). Plaintiff filed her complaint in this court on December 28, 2018. (Doc. No. 1, p. 2).

## II.    STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code provides judicial review of the Social Security Commissioner's denial of social security benefits: "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). When examining a disability determination, a reviewing court is required to uphold the determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence. Id.; Westmoreland Coal Co., Inc. v. Cochran, 718 F.3d 319, 322 (4th Cir. 2013); Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 340 (4th Cir. 2012). A reviewing court may not re-weigh conflicting evidence or make credibility determinations because "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary if his decision is supported by substantial evidence." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005)

(alteration and quotations omitted). "It consists of more than a mere scintilla of evidence but may be less than a preponderance." Pearson v. Colvin, 810 F.3d 204, 207 (4th Cir. 2015) (internal quotation marks omitted). Courts do not reweigh evidence or make credibility determinations in evaluating whether a decision is supported by substantial evidence; "[w]here conflicting evidence allows reasonable minds to differ," courts defer to the ALJ's decision. Johnson, 434 F.3d at 653.

"In order to establish entitlement to benefits, a claimant must provide evidence of a medically determinable impairment that precludes returning to past relevant work and adjustment to other work." Flesher v. Berryhill, 697 F. App'x 212, 212 (4th Cir. 2017) (per curiam) (citing 20 C.F.R. §§ 404.1508, 404.1520(g)). In evaluating a disability claim, the Commissioner uses a five-step process. 20 C.F.R. § 404.1520(a)(4). Pursuant to this five-step process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, could perform any other work in the national economy. Id.; see also Lewis v. Berryhill, 858 F.3d 858, 861 (4th Cir. 2017) (citing Mascio v. Colvin, 780 F.3d 632, 634 (4th Cir. 2015)); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. See Lewis, 858 F.3d at 861; Monroe v. Colvin, 826 F.3d 176, 179–80 (4th Cir. 2016).

The Fourth Circuit has held:

If the claimant fails to demonstrate she has a disability that meets or medically equals a listed impairment at step three, the ALJ must assess the claimant's residual functional capacity ("RFC") before proceeding to step four, which is "the most [the claimant] can still do despite [her physical and mental] limitations [that affect h[er] ability to work]."

<u>Lewis</u>, 858 F.3d at 861-62 (quoting 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)) (alterations in original).

In <u>Lewis</u>, the Fourth Circuit explained the considerations applied before moving to step four:

> [The RFC] determination requires the ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." <u>Mascio</u>, 780 F.3d at 636 (internal quotations omitted); <u>see also</u> SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). Once the function-by-function analysis is complete, an ALJ may define the claimant's RFC "in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. <u>See generally</u> 20 C.F.R. §§ 404.1567, 416.967 (defining "sedentary, light, medium, heavy, and very heavy" exertional requirements of work).
>
> When assessing the claimant's RFC, the ALJ must examine "all of [the claimant's] medically determinable impairments of which [the ALJ is] aware," 20 C.F.R. §§ 404.1525(a)(2), 416.925(a)(2), "including those not labeled severe at step two." <u>Mascio</u>, 780 F.3d at 635. In addition, he must "consider all [the claimant's] symptoms, including pain, and the extent to which [her] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). "When the medical signs or laboratory findings show that [the claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [her] symptoms, such as pain, [the ALJ] must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [her] symptoms limit [her] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

<u>Lewis</u>, 858 F.3d at 862.

Proceeding to step four, the burden remains with the claimant to show he or she is unable to perform past work. <u>Mascio</u>, 780 F.3d at 635. If the claimant meets their burden as to past work, the ALJ proceeds to step five.

> "At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." [<u>Mascio</u>, 780 F.3d at 635] (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429). "The

Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." Id.

Lewis, 858 F.3d at 862.

If the Commissioner meets this burden in step five, the claimant is deemed not disabled, and the benefits application is denied.  Id.

## III.    ANALYSIS

Plaintiff's claims can be divided into three groups.  The first alleges an error in the validity of the ALJ appointment, the second alleges errors in the ALJ's determination of Plaintiff's RFC, and the third alleges errors in the ALJ's application of Plaintiff's RFC.

### A.  Appointments Clause

Plaintiff alleges the ALJ who presided over her case was not properly appointed under the Appointments Clause of the Constitution.[2]  (Doc. No. 10, p. 25); U.S. Const. art. 2, § 2, cl. 2. Plaintiff bases her argument on a recent Supreme Court case requiring Securities and Exchange Commission ("SEC") ALJs to be appointed under the Appointments Clause.  Lucia v. S.E.C., 138 S.Ct. 2044, 2055 (2018).  Defendant asserts that, under Lucia, an Appointments Clause challenge must be raised at the administrative level or it is waived.  Further, Defendant argues, and Plaintiff does not dispute, that Plaintiff did not raise the issue at the administrative level.  (Doc. No. 12, p. 19).

Neither the Supreme Court nor the Fourth Circuit has ruled on whether Lucia applies to SSA ALJs.  There are vast differences in the administration of the SEC and SSA, including the

___

[2] [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law[.]" U.S. Const. Art. 2, § 2, cl. 2.

number of ALJs in each administration[3] and the authority and review of each type of ALJ.[4] Plaintiff relies on Sims v. Apfel in asserting she is not required to raise the Appointments Clause issue with either the ALJ or Appeals Council prior to raising it at the district court level.  Sims v. Apfel, 530 U.S. 103, 112 (2000) ("[W]e hold that a judicially created issue-exhaustion requirement is inappropriate").  However, the Sims Court explicitly stated that "[w]hether a claimant must exhaust issues before the ALJ is not before us."  Sims, 530 U.S. at 107.

Circuits are split on whether the failure to timely raise an Appointments Clause claim at the administrative level waives the claim.  An overwhelming majority of the circuits that have examined the issue post-Sims have held that a plaintiff must raise *all* issues he or she wishes to bring in federal court at the administrative level.  See Shaibi v. Berryhill, 883 F.3d 1102, 1109 (9th Cir. 2017) (citing Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999)) (holding that, at least when represented by counsel, "[claimants] must raise all issues and evidence at their administrative hearings in order to preserve them on appeal"); NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 795, 798 (8th Cir. 2013) (quoting Freytag, 501 U.S. at 893) (finding Appointments Clause claims waived if not raised before the original decisionmaker); Maloney v. Comm'r of Soc. Sec., 480 F. App'x 804, 810 (6th Cir. 2012) (arguments not presented to ALJ or Appeals Council are waived); Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001) (holding the court has "no intention of extending [the Sims] rule . . . to the failure of an applicant to raise an issue at the ALJ level").  The

---

[3] Compare Lucia, 138 S.Ct. at 2049 ("The SEC currently has five ALJs.") with Doug Walker, Answer the Call to Public Service, Become an Administrative Law Judge, Soc. Sec. Admin. (Feb. 11, 2020 at 10:09am), https://blog.ssa.gov/answer-the-call-to-public-service-become-an-administrative-law-judge/ (observing the SSA employs about 1500 of the country's approximately 1700 ALJs).

[4] Compare Office of Administrative Law Judges, S.E.C., (Feb. 13, 2020, 12:05pm) www.sec.gov/page/aljsectionlanding (SEC ALJs have authority to issue a variety of sanctions and orders are reviewed by the Commission, followed by the Court of Appeals) with 20 CFR §§ 422.203, 408.1040 (SSA ALJs limited to holding hearings on only some topics where they can only affirm or deny benefits, and orders are subject to review of Appeals Council, followed by the District Courts).

Third Circuit alone allows an Appointments Clause claim to be raised at the first time at the district court level. Cirko v Comm'r of Soc. Sec., 948 F.3d 148, 159 (3rd Cir. 2020) (finding an exhaustion requirement improper where (1) the SSA regulations regarding ALJ hearings do not explicitly address exhaustion and (2) the individual interest in having the constitutional issue resolved is much higher than the governmental interest in requiring exhaustion).

Moreover, in the wake of Lucia, most of the district courts who have ruled on the issue have rejected Appointments Clause claims that were not raised at the administrative level. See Dewbre v. Comm'r of Soc. Sec., No. 18-cv-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019) (collecting cases from 23 districts). This district has consistently ruled the same. In Garrison v. Berryhill, No. 1:17-cv-00302-FDW, 2018 WL 4924554 (W.D.N.C. Oct. 10, 2018), the Court rejected Plaintiff's Appointments Clause claim for failure to raise it during the administrative proceedings. Id. at *2 (citing Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999)). In Shipman v. Berryhill, No. 1:17-cv-00309-MR, 2019 WL 281313 (W.D.N.C. Jan. 22, 2019), and Jenkins v. Berryhill, No. 1:18-cv-00050-MR, 2019 WL 1317730 (W.D.N.C. Mar. 22, 2019), the argument was again rejected as untimely twice where the Plaintiffs first moved for remand under the Appointments Clause months after filing their appeals with the district court. Shipman, 2019 WL 1281313 at *3; Jenkins, 2019 WL 1317730 at *3. Thereafter, courts have consistently made clear that failure to raise the issue at the administrative level waives the right to raise the issue at the district court. Wampler v. Saul, No 1:19-cv-00092-MOC, 2019 WL 6404403, at *6 (W.D.N.C. Nov. 27, 2019) ("Plaintiff's failure to assert a challenge to the ALJ's appointment before the agency at any point in the administrative proceedings forfeited his Appointments Clause claim"); Moehlenpah v. Berryhill, No. 5:18-cv-00153, 2019 WL 4745287, at *5 (W.D.N.C. Sept.

27, 2019) ("Plaintiff did not make a timely challenge at her hearing before the ALJ. Therefore, Plaintiff has forfeited any right to relief based on Lucia"). Finally, in Taylor v. Saul, No. 3:18-cv-00553-KDB, 2019 WL 6972845 (W.D.N.C. Dec. 18, 2019), the Court clarified, "[a] constitutional challenge under the Appointments Clause is 'nonjurisdictional,' and thus a party may forfeit its Appointments Clause argument by failing to raise it." Id. at *7 (citing RELCO Locomotives, Inc., 734 F.3d at 795, 798).

The majority viewpoint is further supported by the SSA's regulations requiring claimants to raise *all* issues, including objections to the ALJ conducting the hearing, at the administrative level. 20 C.F.R. § 404.933(a)(2) (Requiring a claimant submit in writing "[t]he reasons [the claimant] disagree[s] with the previous determination or decision"); §404.940 ("[O]bject[ions] to the [ALJ] who will conduct the hearing [must be raised at the] earliest opportunity.").

Plaintiff asserts she was not required to raise constitutional issues with the Social Security Administration because the SSA "lacks the authority" to provide a remedy for an Appointments Clause claim. (Doc. No. 10, p. 27). Plaintiff's assertion is incorrect for several reasons. First, the cases Plaintiff relies on do not follow her assertions. The footnote cited in Moore refers specifically to criminal defendants, and Matthews provided a method for the Secretary of the Department of Health, Education, and Welfare to waive exhaustion requirements, not the claimant. Moore v. East Cleveland, 431 U.S. 494, 497, n. 5 (1977); Matthews v. Diaz, 426 U.S. 67, 76 (1976). Second, the rule Plaintiff relies on is not mandatory. Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 215 (1994) ("[W]e agree that '[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.' This rule is not mandatory, however[.]"). The Supreme Court has since required plaintiffs to raise

issues "'[e]ven if' the administrative body could not decide the constitutionality of a federal law." Elgin v. Dep't of Treasury, 567 U.S. 1, 17 (2012) (citing Thunder Basin Coal, 510 U.S. at 215). Finally, although the Administration may not be able to cure a particular ALJ's appointment retroactively, the Administration can remand the case to a properly appointed ALJ. In fact, the SSA has previously provided additional administrative review where claimants raised timely Appointments Clause challenges at the administrative level. See SSR 19-1P, 2019 WL 1324866 (Mar. 15, 2019) (providing additional administrative review where claimants raise timely Appointments Clause challenges to the ALJ or Appeals Council). Thus, there was a remedy available to Plaintiff at the administrative level had she raised this issue properly.

As the Supreme Court has stated, "[t]he Social Security hearing system is 'probably the largest adjudicative agency in the western world.' . . . [t]he need for efficiency is self-evident." Barnhart v. Thomas, 540 U.S. 20, 28-29 (2003). Over 2 million disability claims were filed in 2019, and the SSA conducted approximately 693,000 hearings. SSA, Annual Performance Report, Fiscal Years 2018-2020, at 42, 46 (2019). Each case takes an average of 733 days to get through initial consideration, reconsideration, and a hearing. Id. at 43, 45, 47. As such, this Court considers the efficiency interest of the numerous claimants, the SSA, and the federal court system, in conjunction with the reasons set forth above, and finds that allowing a plaintiff to raise an Appointments Clause claim at any time would wreak havoc on the administration of social security claims. Requiring claimants to timely raise an Appointments Clause claim allows the SSA to provide a remedy to the claim at the administrative level, yielding efficiency and clarity throughout the social security claims process.

**B. Severe Impairments and Formulating RFC**

The majority of Plaintiff's alleged errors fall into this category and claim the ALJ either failed to recognize one of Plaintiff's severe impairments or failed to properly account for the severe impairments when formulating Plaintiff's RFC. (Doc. No. 10, pp. 5, 9, 14, 16, 19, 20). Defendant argues that the RFC and analysis of Plaintiff's rheumatoid arthritis (commonly referred to as "RA") are supported by substantial evidence and that additional function-by-function analysis is not required. (Doc. No. 12, p. 7).

In addition to the specific errors mentioned above and discussed below, the ALJ makes the general error of failing to properly include a narrative explaining how Plaintiff's evidence supports the ALJ's RFC findings. An RFC analysis has three components: "(1) evidence, (2) logical explanation, and (3) conclusion." Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019). In the second step, an ALJ must "build an accurate and logical bridge from that evidence to [her] conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (citing Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016). Failing to properly create a narrative when evaluating a claimant's RFC makes a full review of the ALJ's findings impossible, which is always harmful error. See Patterson v. Comm'r of Soc. Sec. Admin., 846 F.3d 656, 662 (4th Cir. 2017).

The ALJ found numerous exceptions to Plaintiff's RFC of light work, relating to Plaintiff's ability to climb ladders, ramps, and stairs; balance, stoop, kneel, crouch, and crawl; handle and finger; be exposed to workplace hazards; tolerate simple, routine, repetitive tasks; perform at a production rate; tolerate workplace change; and interact with the public; as well as Plaintiff's need to alternate between sitting and standing. (Tr. 23). None of these exceptions are connected to Plaintiff's impairments with a logical explanation in the ALJ's written opinion. The ALJ merely

assesses Plaintiff's impairments and states her conclusion regarding Plaintiff's RFC. (Tr. 23-28). A proper analysis would bridge that gap, explaining how Plaintiff's ailments cause her limitations, and why some limitations are "occasional" and others "frequent."

The ALJ fails to properly explain her reasoning for Plaintiff's RFC and does not create the "logical bridge" between Plaintiff's impairments and RFC. The Court does not express an opinion as to whether the ALJ's reasoning and RFC formation is correct, but does require the ALJ to better explain her reasoning so that review is possible. Because Plaintiff also raised other errors which may recur on remand, the court will address them as well. See Woods, 888 F.3d at 694.

i. Rheumatoid Arthritis

The "treating physician rule" generally requires an ALJ to give greater weight to the testimony of a treating physician. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam) (citing Campbell v. Bowen, 800 F.2d 1247, 1250 (4th Cir. 1986); Johnson, 434 F.3d at 654 (citing Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). It requires "persuasive contrary evidence" to give lesser weight to a treating physician's testimony. Hunter, 993 F.2d at 35.

Plaintiff's treating rheumatologist, Mayur Patel, MD, diagnosed Plaintiff with seronegative arthritis. (Tr. 763). Seronegative arthritis is a form of RA that presents without an elevated rheumatoid factor. Jennifer Freeman, MD, Seronegative RA: What are the Symptoms of Seronegative RA?, Rheumatoid Arthritis Support Network, (Feb. 10, 2020, 4:40pm), https://www.rheumatoidarthritis.org/ra/types/seronegative/. As with other forms of rheumatoid arthritis, the symptoms of seronegative arthritis can wax and wane in severity over time. Jennifer Freeman, MD, RA Progression: What are the Signs of Rheumatoid Arthritis Progression?, Rheumatoid Arthritis Support Network, (Feb. 10, 2020, 4:35pm),

https://www.rheumatoidarthritis.org/ra/symptoms/progression/ ("Symptoms may come and go over the course of the disease").

The ALJ claims Plaintiff "has not been diagnosed with rheumatoid arthritis," (Tr. 25), yet the ALJ included "seronegative arthritis" in the list of Plaintiff's impairments, (Tr. 19), and admits "[Plaintiff] was diagnosed with seronegative arthritis." (Tr. 25). The ALJ found Plaintiff was not suffering from RA based on the opinion of the State Examiner (whose opinion was based on Plaintiff's lack of an increased rheumatoid factor), despite Plaintiff's heightened erythrocyte sedimentation rate ("ESR"), a measure of inflammation in the body. (Tr. 25). This is in direct conflict with the definition of seronegative arthritis, which the ALJ conceded Plaintiff suffered from.

The ALJ also does not explain why she discounts Plaintiff's treating rheumatologist's diagnosis in favor of the State Examiner's opinion, despite a treating specialist's opinion generally being afforded the higher evidentiary weight. Hunter, 993 F.2d at 35. While the ALJ does consider and assign weight to some of the medical opinions presented in the case, (Tr. 28-29), the opinion of Dr. Patel (Plaintiff's rheumatologist) is not weighed. The Court does not attempt to specify what weight should be assigned to the reports and opinions of Dr. Patel, but does require the ALJ to explain the weight given to a doctor's opinion, and to specify what "persuasive contrary evidence" warrants a lower weight if one is given. Hunter, 993 F.2d at 35.

The ALJ erred in discounting the opinion of Dr. Patel, and in assuming that a lack of rheumatoid factor means a claimant does not have RA. The remaining evidence in the ALJ's opinion shows Plaintiff has experienced degenerative changes associated with RA, has been diagnosed by a specialist with a form of RA, experiences joint pain, and has her symptoms relieved

by medicine that treats RA. (Tr. 25). This is not "substantial evidence" showing Plaintiff does not have seronegative RA. Because the ALJ based her findings on insufficient evidence, she erred in finding Plaintiff did not have RA due to Plaintiff's normal rheumatoid factor and mild degeneration, despite this being contrary to the diagnosis of Plaintiff's rheumatologist and the definition of Plaintiff's ailment.

This mistake in acknowledging Plaintiff's RA means that the ALJ could not have considered the full effects of Plaintiff's arthritis when determining Plaintiff's RFC. While the Court is unable to determine what evidence the ALJ used to determine any part of Plaintiff's RFC, by rejecting the possibility that Plaintiff has RA, the ALJ could not possibly have considered it when forming Plaintiff's RFC. Because she both failed to show sufficient evidence to support a finding that Plaintiff does not have RA and failed to properly assess Plaintiff's arthritis when creating Plaintiff's RFC, the ALJ committed harmful error.

ii.  Obesity Non-Compliance and Assessment

Plaintiff argues the ALJ improperly discounted the effects of Plaintiff's obesity because of Plaintiff's inability to lose weight, (Doc. No. 10, p. 16), and the ALJ erred in evaluating the limitations that Plaintiff's obesity imposes. (Doc. No. 10, p. 13). Defendant contends the ALJ properly discounted Plaintiff's obesity due to Plaintiffs "poor dietary compliance" and lack of evidence of exercise, and that the ALJ's RFC analysis was based on substantial evidence of Plaintiff being unaffected by the obesity. (Doc. No. 12, p. 12).

The SSA released a Policy Interpretation Ruling about evaluating obesity stating "[t]reatment for obesity is often unsuccessful. Even if treatment results in weight loss at first, weight loss is often regained, despite the efforts of the individual to maintain the loss." SSR 02-

14

1P, 2002 WL 34686281, at *2 (Sept. 12, 2002). SSR 02-1P further says "the goal of realistic medical treatment for obesity is only to reduce weight by a reasonable amount that will improve health and quality of life. People with extreme obesity, even with treatment, will generally continue to have obesity." Id. at *8. Finally, SSR 02-1P states "an individual must follow treatment prescribed by his or her physician *if the treatment can restore the ability to work*. . . . We will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits." Id. at *9 (emphasis added). There are three elements required to deny benefits based on failure to comply with obesity treatment: (1) "The individual has an impairment(s) that meets the definition of disability, including the duration requirement," (2) "a treating source has prescribed treatment that is clearly expected to restore the ability to engage in substantial gainful activity," and (3) "the evidence shows that the individual has failed to follow prescribed treatment without a good reason." Id. Moreover, the regulations make clear that a prescription for treatment for obesity is to be strictly construed: "[a] treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is *not* prescribed treatment." Id. (emphasis added). While Defendant cites two Fourth Circuit cases to show failure to comply with treatment means that a plaintiff can no longer be found disabled, neither of the cases discuss a plaintiff who fails to comply with treatment for obesity, and both took place prior to the 2002 release of SSR 02-1P. See generally Gross v. Heckler, 785 F.2d 1163 (4th Cir. 1986); Purdham v. Celebrezze, 349 F.2d 828 (4th Cir. 1965).

Once it is determined that a claimant suffers from obesity, its effects on the individual must be assessed like any other impairment. SSR 02-1P, 2002 WL 34686281, at *6. These effects could be related to the individual's exertional functions (sitting, standing, walking, lifting,

carrying, pushing, or pulling), postural functions (climbing, balancing, stooping, crouching), ability to manipulate objects, ability to tolerate extreme weather (heat or humidity), or even just the ability to maintain pace. Id. The ALJ must explain how they reach their conclusions, "as with any other impairment." Id. at *7. An ALJ must do more than "state[] in a conclusory fashion that [a] [p]laintiff's obesity had been considered," and should give "meaningful consideration of [a] [p]laintiff's obesity, its effects on exertional functions, her ability to perform routine movement and necessary physical activity within the work environment, or the combined effects of her obesity and other impairments." Peterson v. Colvin, No. 1:12-cv-0052-MR, 2013 WL 856167, at *2 (W.D.N.C. Feb. 28, 2013). However, it is possible for an ALJ to implicitly show that obesity was considered, namely where the ALJ has discussed the claimant's obesity in other areas of the decision and gives significant weight to the opinions of doctors who considered the obesity. Yarborough v. Colvin, No. 1:13-cv-00180-MR, 2014 WL 4700684, at *2 (W.D.N.C., Sept. 22, 2014). In Yarborough, the ALJ was found to have implicitly considered the claimant's obesity after referring to plaintiff's obesity in four areas of the record and giving significant weight to medical consultants who had considered the claimant's obesity. Id.

The ALJ here points to no evidence that Plaintiff's weight management would have been successful even if followed perfectly, nor that the success would have been such that it would restore Plaintiff's ability to work as required by SSR 02-1P. While Plaintiff was given some sort of dietary advice from a physician, (Tr. 24, 26), the ALJ does not state whether this was intended to control Plaintiff's weight, or merely her blood sugar levels. The first would be evidence relating to plaintiff's obesity, the second would relate only to some of the issues from Plaintiff's diabetes. Unfortunately, the ALJ fails to explain where Plaintiff's non-compliance was considered, so the

Court cannot know which of Plaintiff's impairments the ALJ believes is made less credible by the dieting issues. The ALJ also brings up an exercise regimen given to Plaintiff as evidence of non-compliance, but only states that Plaintiff was told to be compliant "at all times" and there is no evidence of Plaintiff's adherence. (Tr. 26). The ALJ does not cite to evidence of Plaintiff's lack of adherence, however, and simply being told to adhere to an exercise regime is not presumptive evidence that one does not adhere to it. Finally, when citing to Plaintiff's alleged dietary noncompliance, (Tr 26), the ALJ cites to a medical record stating that Plaintiff "is taking medications for [her appetite]," and is "working on [her weight] and tak[ing] some dietary classes." (Tr. 1117). This is not "substantial evidence" of dietary non-compliance.

Aside from where she references Plaintiff's dietary non-compliance, the ALJ properly assessed the Plaintiff's obesity despite not explicitly discussing it. The ALJ mentions the Plaintiff's obesity five times: twice in lists of severe impairments, (Tr. 19, 24), once in passing reference, (Tr. 20), once in detail when assessing if Plaintiff's impairments are equivalent to the impairments found in the Listings (Tr. 24), and once when discussing Plaintiff's non-compliance. (Tr. 26). While none of these are the explicit explanations of how Plaintiff's obesity informed her RFC, it is enough to show that the ALJ considered Plaintiff's obesity. The ALJ also considered the opinions of medical examiners who had considered Plaintiff's obesity and gave them either some or significant weight. (Tr. 28). This, as in Yarborough, would seemingly render any error harmless.

As mentioned above, however, the ALJ considered not just the opinion of the medical examiners in discounting Plaintiff's obesity, but also Plaintiff's non-compliance. In a situation like this, where the ALJ has considered both proper and improper evidence (or the lack thereof, in

17

the case of discussing Plaintiff's exercise regimen) in making a determination, it cannot be considered harmless error. Moreover, when the ALJ discusses Plaintiff's non-compliance, (Tr. 24, 26), the ALJ cites to medical opinions referencing dietary compliance and controlling her weight but stopping short of being an actual "prescription" under the regulations, which is required for the Commissioner to find failure to follow prescribed treatment. E.g., (Tr. 24, 26, 672); SSR 02-1p, 2002 WL 34686281, at *9. The ALJ's improper assessment of Plaintiff's dietary and exercise non-compliance thus constitutes reversible error.

iii. Smoking non-compliance

The ALJ also found Plaintiff to be non-compliant in stopping smoking. (Tr. 27). Plaintiff argues that the ALJ erred in finding this despite evidence of Plaintiff's attempts to quit smoking with limited success. (Doc. No. 10, p. 19). Defendant argues that Plaintiff's continued smoking is substantial evidence sufficient to support the finding. (Doc. No. 12, p. 13).

Generally, failure to follow prescribed treatment which might improve an individual's symptoms can be evidence that the symptoms are not as severe as the individual claims. SSR 16-3P, 2017 WL 5180304 at *9 (Oct. 25, 2017). To find that an individual failed to follow prescribed treatment, the treatment must be "clearly expected to restore capacity to engage in [gainful activity]," the claimant must have "refus[ed] to follow prescribed treatment," and the failure to follow must not be justifiable. SSR 82-59, 1982 WL 31384 at *1 (Jan. 1, 1982).

Where a cessation of smoking would improve a claimant's condition, there is usually evidence of improvement when the claimant cuts back on their smoking. Thornsberry v. Astrue, No. 4:08-4075-HMH-TER, 2010 WL 146483, at *3 (D.S.C. Jan 12, 2010) (ALJ properly considered Plaintiff's failure to stop smoking where evidence showed improvement in Plaintiff's

18

condition when Plaintiff cut back on smoking). Courts have also distinguished between a plaintiff who refuses treatment (and thus does not even attempt to comply) and one who attempts to comply and fails. <u>Seals v. Barnhart</u>, 308 F. Supp. 2d 1241, 1250-51 (N.D. Ala. 2004) (reasoning that failure to completely cease smoking is not relevant where there is evidence the claimant attempts to stop or succeeds in lessening their smoking, as this shows the claimant is attempting to comply). Put another way, a claimant who attempts to cease an addictive activity and fails may be justified in their failure due to the addictive nature of the activity.

Defendant cites only a single case to defend his position that non-compliance with a doctor's recommendation to stop smoking is the same as refusing prescription treatment, <u>see</u> (Doc. No. 12, p. 13); <u>Sias v. Sec'y of Health and Hum. Servs.</u>, 861 F.2d 475, 480 (6th Cir. 1988) (holding the plaintiff was noncompliant in losing weight and stopping smoking, and the court felt that this behavior was "not consistent with that of a person who suffers from intractable pain"). However, the plaintiff in <u>Sias</u> also refused to wear prescription hose, and was being evaluated for his pain, a very subjective ailment, <u>id.</u>, and recent cases are more aware of the effects of nicotine addiction and the difficulties in breaking an addiction. <u>Shramek v. Apfel</u>, 226 F.3d 809, 813 (7th Cir. 2000) ("Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health."); <u>Seals</u>, 308 F. Supp. 2d at 1251 (N.D. Ala. 2004) ("Breaking an addiction is not a simple matter of rationally deciding to cease the addictive behavior, whether it be smoking, drinking, or drug abuse."); <u>cf.</u> <u>Scott v. Heckler</u>, 770 F.2d 482, 486-87 (5th Cir. 1985) (noting alcoholism may be an impairment even though claimant was told to stop drinking).

Here, the ALJ fails to acknowledge the fact that Plaintiff has made efforts to lower her

tobacco intake, as Plaintiff reported she briefly quit smoking (Tr. 27, 681), and was smoking just "three cigarettes a day" in 2017, compared to two packs a day three years prior. (Tr. 48). This evidence, unacknowledged by the ALJ, shows that Plaintiff was attempting to comply with her prescription in the same way as the plaintiff in Seals. Like the plaintiff in Seals, Plaintiff cannot be said to have refused treatment after attempting to comply and having moderate success. Further, there is no evidence the treatment would "clearly restore [Plaintiff's] capacity" as required. If Plaintiff's condition would be improved by her quitting smoking, there should be some evidence that Plaintiff's condition improved during the time where Plaintiff was smoking less. The ALJ therefore failed to properly show either that quitting smoking would clearly restore Plaintiff's capacity, or that Plaintiff refused to follow her prescribed treatment.

Due to the ALJ's failure to show the connection between Plaintiff's RFC and Plaintiff's impairment and noncompliance, the court is unable to determine where the ALJ factored Plaintiff's smoking non-compliance into Plaintiff's RFC. As mentioned above, this is a reversible error. Patterson, 846 F.3d at 662. Additionally, because the ALJ found Plaintiff willfully refused to follow treatment without substantial evidence to support her opinion, and because the ALJ failed to show how she considered Plaintiff's alleged non-compliance when creating Plaintiff's RFC, the ALJ committed harmful error.

    iv.   Grip Strength

In the ALJ's written decision, the ALJ devotes only part of one paragraph discussing Plaintiff's grip strength. (Tr. 21). The ALJ notes Plaintiff has been found by a medical practitioner to have decreased grip strength, but discounts this medical opinion because Plaintiff is able to use a walker. (Tr. 21). Despite the several pieces of evidence Defendant raises to defend this decision

in his memorandum, (Doc. No. 12, p. 10), none of them appear in the written decision of the ALJ. These arguments are not considered because courts do not allow *post hoc* theories by the government to support findings where an ALJ did not bother to raise them. Cordova v. Holder, 759 F.3d 332, 338 (4th Cir. 2014) (citing Li Fang Lin v. Mukasey, 517 F.3d 685, 693 (4th Cir. 2008)).

An ALJ is not permitted to substitute their own opinion for that of medical professionals. See Brown v. Comm'r, Soc. Sec. Admin, 873 F.3d 251, 271 (4th Cir. 2017) (citing Wilson v. Heckler, 743 F.2d 218, 221 (4th Cir. 1984)). Here, the ALJ does not cite any medical opinions stating that Plaintiff does not have reduced grip strength, or the reports of any doctor expressing the belief that Plaintiff's use of a walker was incompatible with Plaintiff's alleged reduced grip strength. (Tr. 21). The ALJ appears to have come to this conclusion based solely on the ALJ's opinion, which is impermissible. The only medical evidence put forward by the ALJ is that "the claimant has been noted for some decrease in grip strength." (Tr. 21). Based on this single piece of evidence, the ALJ does not have substantial evidence to find Plaintiff has no decrease in gripping ability.

Because the ALJ improperly substituted her own opinion for that of the medical experts, and because the ALJ's decision was not supported by substantial evidence, the ALJ erred in assessing Plaintiff's grip strength. This error was likely repeated by the ALJ then incorporating this error into the Plaintiff's RFC by not adequately considering Plaintiff's impairment, but this is impossible to know due to the ALJ's failure to properly connect Plaintiff's impairments to her RFC. As stated above, this failure is a separate reversible error. Patterson, 846 F.3d at 662.

     v.    Daughter's Statement

The ALJ dismissed the statement of Plaintiff's daughter because the ALJ claimed that under 20 CFR §§ 404.1513, 416.913, "reports about an impairment must come from acceptable medical sources," and family members "cannot be considered a disinterested third party." (Tr. 29). The ALJ also discredited the statement because the opinion is inconsistent with evidence of Plaintiff's non-compliance, lack of difficulty moving, and stable condition. (Tr. 29). Plaintiff argues that this was improper and based on insufficient evidence. (Doc. No. 10, p. 24). Defendant does not defend their arguments based on 20 CFR §§ 404.1513 and 416.913, but does contend that the daughter's statement was properly dismissed due to substantial contrary evidence. (Doc. No. 12, p. 14).

Evidence from a non-medical source can be "any information . . . about any issue in [a plaintiff's] claim." 20 C.F.R. §§ 404.1513(a)(4), 416.913(a)(4). Medical sources are only required to "establish the existence of a medically determinable impairment." SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006). The SSA, in giving examples of non-medical sources, includes both friends and family of a plaintiff. Id.; SSR 16-3P, 2017 WL 5180304, at *7. The ALJ's argument that reports can come only from acceptable medical sources or that family members cannot be disinterested third parties is incorrect.

The ALJ's first two reasons for discounting Plaintiff's daughter's statement are errors by the ALJ, as they are based on an incorrect legal standard. It is also worth noting that the ALJ's finding that Plaintiff could sit and stand at will is likely an insignificant inconsistency because it is explainable by the symptoms of Plaintiff's seronegative RA. Testamark v. Berryhill, 736 F. App'x 395, 398-99 (4th Cir. 2018) (evidence of claimant's fair judgment was not inconsistent with claimant's inability to work because the symptoms of claimant's mental illness "may wax and

wane over the course of treatment"); Jennifer Freeman, MD, *supra*, <u>RA Progression</u>. However, the ALJ also discredited Plaintiff's daughter's opinion due to its inconsistencies with other evidence, including Plaintiff's medicinal non-compliance and stable, controlled condition. (Tr. 29). Therefore, there is still sufficient evidence to discount the daughter's opinion despite the errors in finding the legal standard discussed above. This error is therefore harmless.

### C. Applying RFC

Plaintiff contends that there is an apparent conflict between Plaintiff's RFC requirement of "short, routine, repetitive instructions" and DOT reasoning levels of 2 or 3, as required by the jobs cited by the VE at Plaintiff's hearing. (Tr. 31). At the time parties briefed this case, the Fourth Circuit had yet to rule on this issue. Since that time, however, the Fourth Circuit has twice held that an RFC requiring "short, routine, repetitive instructions" is not equivalent to the RFC limitation in <u>Thomas</u> and is not inconsistent with a DOT reasoning level of 2. <u>Lawrence v. Saul</u>, 941 F.3d 140, 143 (4th Cir. 2019); <u>King v. Saul</u>, 787 F. App'x 170, 171 (4th Cir. 2019). The Fourth Circuit has not reached the issue of whether "short, routine, repetitive instructions" are inconsistent with a DOT reasoning level of 3. The VE at Plaintiff's hearing testified that Plaintiff could work both the marker and photocopier jobs, which have a combined total of 185,000 jobs nationwide and only require a reasoning level of 2. These two jobs alone represent occupations Plaintiff can perform which exist in sufficient number in the economy to find that Plaintiff is not disabled. There is no inconsistency between Plaintiff's RFC and DOT reasoning level 2 and Plaintiff has sufficient nationwide jobs at a reasoning level 2 to support a non-disability finding. <u>See</u> <u>Hicks v. Califano</u>, 600 F.2d 1048, 1051 n. 2 (4th Cir. 1979) (110 available jobs are not an insignificant amount). Accordingly, the Court sees no reason to reach the issue of whether

Plaintiff's RFC is inconsistent with a DOT reasoning level of 3; it would be harmless error at worst.

## IV.    CONCLUSION

Plaintiff's Motion for Summary Judgment (Doc. No. 9) is GRANTED, Defendant's Motion for Summary Judgment (Doc. No. 11) is DENIED, and the case is REVERSED and REMANDED to the Commissioner for further proceedings.

IT IS SO ORDERED.


Signed: March 19, 2020


Frank D. Whitney
Chief United States District Judge